PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CLARENCE SANFORD, | ) | |
| | ) | CASE NO. 5:11cv2360 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| LISA STEWART, *et al.*, | ) | |
| | ) | **MEMORANDUM OF OPINION AND** |
| Defendants. | ) | **ORDER** [Regarding ECF No. 68] |

This matter is before the Court on the Motion for Summary Judgment filed by Defendants

Sandra Flood, Denise James, Suzanne Moore, Cheryl Richards, Lisa Stewart and Adrienne

Welfle (collectively, "Defendants").  ECF No. 68.  The Court has been advised, having reviewed

the record, the parties' briefs and the applicable law.  For the reasons that follow, the Court

denies Defendants' motion in part and grants the motion in part.

## I.  Background

### A.  Parties and Claims

Plaintiff was at all times relevant to the allegations in the instant case a juvenile

incarcerated at the Indian River Juvenile Correctional Facility ("IRJCF") located in Stark County,

Ohio.  ECF No. 1 at 3, ¶5.  He commenced this civil rights action pursuant to 42 U.S.C. § 1983

against Defendants, six nurses employed by the Ohio Department of Youth Services ("DYS")

and assigned to IRJCF.  ECF No. 1 at 3 ¶¶3, 6-11.  Plaintiff alleges that Defendants' actions and

omissions subjected him to cruel and unusual punishment in violation of the Eighth Amendment,

in that they "refused to provide timely and urgent medical attention after receiving notice of

(5:11cv2360)

Plaintiff's symptoms, and as a result Plaintiff [] became septic, contracted pneumonia, had to be hospitalized and undergo surgery." ECF No. 1 at 1, ¶1.

Defendants move for summary judgment, arguing they are entitled to judgment as a matter of law and qualified immunity. ECF No. 68.

**B. Medical Complaint Procedures at IRJCF**

At IRJCF, youth medical complaints are initially addressed by nurses. Youth may seek medical care from a nurse by going to the medical portion of the facility; notifying staff members; or completing a "Health Service Request." ECF Nos. 74-6 at 6; 1 at 7, ¶¶20, 21. After seeing a youth with a medical complaint, the nurses document the event in the Interdisciplinary Progress Notes ("progress notes"), a binder in which all information about medical complaints and the course of treatment is entered. ECF No. 77-5 at 7.

Dr. Barbara Volk, an independent contractor, was the IRJCF physician during the relevant time period. ECF No. 74-4 at 10, 28. She reviewed and updated "standing orders," which are written instructions regarding how the nurses are to handle certain medical complaints. Id. at 39-31. The standing orders permit nurses to dispense with over-the-counter medications. Id. They are designed to treat youth for relatively minor ailments, thereby avoiding the need to call Dr. Volk every time a youth has a medical complaint. Id. Accordingly, nurses could distribute medications to youth pursuant to standing orders without notifying Dr. Volk. Id.

At all times Dr. Volk was on call.[1] ECF No. 1 at 7, ¶25. She also visited the facility on

---

[1] Dr. Volk testified as to her availability as follows: "[b]y pager, I was available from—myself, from 9:00 Sunday night until 5:00 Friday. And then from 5:00 on Friday until Sunday evening, it was either myself or one of the physicians that was in my rotation. And when

(5:11cv2360)

Wednesday mornings to see youth whom the nurses had added to the "health call list," comprised of sick or injured youth. ECF Nos. 1 at 7, ¶25; 74-4 at 28-29.

### C. Facts As Alleged by Plaintiff

Plaintiff injured his hip on September 20, 2007 while playing football at IRJCF. ECF No. 1 at 6, ¶14. He was seen by Nurse Stewart for pain in his left hip, and was given 600 milligrams of Motrin "for his discomfort." *Id.* Stewart did not inform a physician of Plaintiff's injury or refer him for further evaluation. *Id.*

On October 10, 2007, Plaintiff submitted a "Health Services Request" due to problems with allergies "and leg pain." *Id.* at ¶15. This request was received by Nurse Moore on October 11, 2007. *Id.* On October 11, at 6:10 a.m. Plaintiff was seen by an unidentified nurse because of his leg pain, and was treated with 600 milligrams of Motrin. *Id.* at ¶16.[2] On October 11, 2007, Plaintiff submitted a second "Health Services Request" due to "upper left leg pain." *Id.* at ¶17. This request was received by Nurse Moore on October 12, 2007. *Id.* She saw him at 7:00 a.m. and gave him 400 milligrams of Motrin. *Id.* Moore did not inform a physician or superior of Plaintiff's condition, nor refer him to any physician for further evaluation. *Id.* In the documentation of her October 12, 2007 assessment of Plaintiff's complaint of leg pain, Nurse Moore wrote "no history of injury." *Id.*

On November 27, 2007 Plaintiff submitted a third "Health Services Request" in which he

---

I was out of town, on vacation, Dr. Hollaway covered." ECF No. 74-4 at 34.

[2] These recitations are taken from Plaintiff's Complaint, which does not always make clear the actor or reasons why actions were taken or not taken.

(5:11cv2360)

stated his health concern as "left leg when I walk it causes me pain." *Id*. at 7, ¶20.  At 8:55 a.m.

on November 28, 2007, Plaintiff was seen by Nurse Welfle, whom evaluated his condition as

"left leg stiff from playing ball, NAD ("no a[c]cute distress")" and gave him 500 milligrams of

Tylenol, advising him to "do stretching before sports." *Id*. at ¶21.  She did not inform a

physician or superior of his condition despite Dr. Volk's presence at the facility that morning to

visit youths that had been added to the sick call list. *Id*. at ¶25.  That afternoon, Nurse Welfle

wrote on Plaintiff's Health Services Request form from the previous day, "No injury ... Left Hip

X-ray ordered per youth request." *Id*. at ¶22.

     A video tape shows Plaintiff playing basketball during recreation late in the afternoon on

November 28, 2007; he appears to be limping.  ECF No. 75-10.  During recreation Plaintiff was

allegedly struck by another youth in the area of his left hip.  ECF No. 77 at 8.  A video tape then

shows Plaintiff being half-carried to the medical clinic by two other youth.  ECF No. 1 at 7, ¶23.

He appears to be in pain. *See* ECF No. 75-10.  At the clinic, Plaintiff is seen by two nurses,

Stewart and James, for "severe L hip pain."  ECF No. 1 at 7, ¶24.  Nurse James called the mobile

x-ray unit for an x-ray, and Plaintiff was given 600 milligrams of Motrin and reported to have

"ambulated with a limp out of medical." *Id*.  The nurses did not notify Dr. Volk. *Id*. at ¶25.

     On the morning of November 29, 2007, dormitory staff advised Nurse Moore that

Plaintiff did not want to come to medical because of his "sore hip." *Id*. at 8, ¶26.  At 7:30 a.m.,

Nurse Richards gave Plaintiff 600 milligrams of Motrin "for severe pain left hip." *Id* at ¶27.  At

10:45 a.m. Richards gave him another 600 milligrams of Motrin, noting that he was walking

"with a limp." *Id*..  At 2:05 p.m., Plaintiff was seen by Nurse Welfle due to "complaint of leg."

4

(5:11cv2360)

*Id*. at ¶28.  Contrary to Nurse Richard's earlier observation the same day, Nurse Welfle claimed

in her documentation that Plaintiff "has been walking normal all day.  Was sent to ISS— now

states leg hurts."[3]  *Id*.  Nurse Welfle does not document giving Plaintiff any treatment.  *Id*.

At 5:20 p.m., Plaintiff was seen by Nurse Stewart, whose progress notes state that

Plaintiff had "left pelvis discomfort" which was "[t]ender to touch"; that he was "limping"; and

that he had a fever of 100.1.  *Id*. at ¶29.  Stewart gave Plaintiff 600 milligrams ibuprofin and a

warm compress, but did not contact a physician or notify a superior of his condition.[4]  *Id*.  Nurse

Stewart did, however, add Plaintiff to the sick call list to be seen by Dr. Volk on her next regular

visit to IRJCF, which was six days later, on December 5, 2007.  *Id*. at ¶30.

On or about November 30, 2007, the results of the x-ray came back negative.[5]  *Id*. at 9,

¶32.  The x-ray, however, did not include Plaintiff's left iliac crest, in which it would later be

discovered he had suffered a fracture.  *Id*. at  ¶33.  On November 30, 2007 Plaintiff was seen by

Nurse Welfle for his left hip.  *Id*.  Welfle initiated a "[s]tanding order for Motrin" and instructed

Plaintiff to "[i]ncrease fluids and try to walk around."  *Id*.

On December 1, 2007 the IRJCF "Unit Log" entry states Plaintiff "complaining about leg

hurting" at 7:00 a.m.  *Id*. at ¶34.  At 8:30 a.m., Plaintiff was seen by Nurse Moore, whom wrote

in her progress notes that "[y]outh refused earlier to come for medication, now in medical

---

[3]  "ISS" stands for in-school suspension.  ECF No. 75-17 at 7.

[4]  Defendants dispute Plaintiff's version of events and argue that Stewart notified her
superior, Robert Walker, R.N.

[5]  The x-ray was interpreted by a radiologist and the report transmitted to IRJCF.  ECF
No. 75-18.

5

(5:11cv2360)

complaining of left hip pain." *Id.* at ¶35.  She also noted that "youth refuses to allow nurse to do

assessment.  Told him to apply hot moist washcloth to hip and come at 11am for ordered meds."

*Id*.

At 9:05 p.m., Nurse Flood made the following entry in the progress notes for Plaintiff:

"Meds to dorm. Youth lying in bed refuses to get up c/o (complaining of) chest pain youth finally

raised torso up slightly and took meds when asked how long he had chest pain he laid back down

and covered his head with his blanket." *Id.* at ¶37.

On December 2, 2007 at 12:20 p.m., a request was made for a nurse to go to the

dorm to see Plaintiff due to hip pain.  *Id.* at 10, ¶39.  Nurses Flood and Moore brought Plaintiff

to medical in a wheelchair, and in her progress notes entry Nurse Flood wrote, "youth appears

dehydrated. Lips are dry & cracked," that he had a fever of 101.2 and "[ r]equired assistance in

transport from chair to exam table.  Major [complaint] is left inguinal area.  There is extreme

tenderness ... in this area ... Youth smells of fecal material." *Id.*  at ¶40.

 Plaintiff was then taken to the hospital where he subsequently was diagnosed with a

fractured hip (iliac crest), sepsis and diffused pneumonia.  *Id.* at ¶41.  He was hospitalized for a

total of twenty days, had to be transported to another hospital for surgery to drain the infection in

his hip and iliac crest and required a blood transfusion.  *Id.*; ECF No. 77 at 5.  He was in the

intensive care unit, on a ventilator, and in respiratory isolation.  ECF No. 77 at 6.  He had septic

emboli to the lungs with pneumonia; was on IV antibiotics; and was in four point medical

restraints so he would not pull out the Endotracheal Tube.  *Id*.  In short, Plaintiff was very ill.

An investigation was conducted by the Chief Inspector's Office of the DYS, and a report

6

(5:11cv2360)

produced.  *Id*. at 5.  The DYS report concluded that "medical personnel failed to provide

adequate medical care."  ECF No. 75-1 at 13.  This lawsuit followed.

## II.  Legal Standard

Summary judgment is appropriately granted when the pleadings, the discovery and

disclosure materials on file, and any affidavits show "that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a);

*see also Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005).  The moving party is not required

to file affidavits or other similar materials negating a claim on which its opponent bears the

burden of proof, so long as the movant relies upon the absence of the essential element in the

pleadings, depositions, answers to interrogatories, and admissions on file.  *Celotex Corp. v.

Catrett*, 477 U.S. 317, 322 (1986).  The moving party must "show that the non-moving party has

failed to establish an essential element of his case upon which he would bear the ultimate burden

of proof at trial."  *Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 403 (6th Cir. 1992).

Once the movant makes a properly supported motion, the burden shifts to the non-moving

party to demonstrate the existence of a genuine dispute.  An opposing party may not simply rely

on its pleadings; rather, it must "produce evidence that results in a conflict of material fact to be

resolved by a jury."  *Cox v. Ky. Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).  The

non-moving party must, to defeat the motion, "show that there is doubt as to the material facts

and that the record, taken as a whole, does not lead to a judgment for the movant."  *Guarino*, 980

F.2d at 403.  In reviewing a motion for summary judgment, the court must view the evidence in

the light most favorable to the non-moving party when deciding whether a genuine issue of

(5:11cv2360)

material fact exists.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986)*; Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).

The United States Supreme Court, in deciding *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), stated that in order for a motion for summary judgment to be granted, there must be no genuine issue of material fact.  *Id.* at 248.  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  In determining whether a factual issue is "genuine," the court must decide whether the evidence is such that reasonable jurors could find that the non-moving party is entitled to a verdict.  *Id.*  Summary judgment "will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  To withstand summary judgment, the non-movant must show sufficient evidence to create a genuine issue of material fact.  *Klepper v. First Am. Bank*, 916 F.2d 337, 342 (6th Cir. 1990).  The existence of a mere scintilla of evidence in support of the non-moving party's position ordinarily will not be sufficient to defeat a motion for summary judgment.  *Id.*

### III.  Analysis

#### A.  Factual Dispute Regarding Whether the Nurses Notified the Doctor

A component of Plaintiff's case involves his allegation that the nurses did not inform the doctor of his condition.  *See, e.g.*, ECF Nos. 1 at 11, ¶44; 77 at 16.  Defendants argue that evidence shows the nurses did notify their superiors, Health Services Administrator Robert Walker, R.N. and Dr. Volk.  ECF No. 79 at 3.  In support, Defendants rely on the declarations of Nurses Richards and Stewart and the medical records "depicting that HSA Walker signed off on the negative x-ray report . . . and that Dr. Volk gave a telephone order [ ] on November 30, 2007,

8

(5:11cv2360)

which she signed off on as well." ECF No. 79 at 5.  Defendants contend that Plaintiff ignores

this evidence and "suggests that Defendant Nurses Richards and Stewart simply suggested that

they alerted their supervisor, HSA Walker as well as Dr. Volk." ECF No. 79 at 5.

> In her declaration, Nurse Richards stated,
>
> The following day, November 30, 2007, the medical records reflect that I
> contacted the treating physician, Dr. Barbara Volk by telephone and obtained an
> order for scheduled Motrin to be administered at 400 milligrams orally, four times
> per day (See Physician Order, Exhibit M).  Prior to prescribing any medication,
> Dr. Volk would have required me to explain both the nature of my call as well as
> a current update of the youth's medical condition.  Accordingly, I would have
> advised Dr. Volk of Mr. Sanford's x-ray results as well as his continued
> complaints of pain.

ECF No. 68-6 at 1-2, ¶6.[6]  Notably, although Nurse Richards rejoins that the "medical records

reflect" that she "contacted" Dr. Volk, she does not aver that she actually made contact with or

communicated with Dr. Volk.  Moreover, Richards states what Dr. Volk "would have required

[her] to" do—not what Dr. Volk had her to do.

> Nurse Stewart testified that she did not communicate her concerns about Plaintiff to Dr.

Volk.  ECF No. 74-5 at 11.  Despite Stewart's testimony, Defendants argue that "the telephone

order given by the treating physician, Dr. Volk[,] on November 30, 2007 confirms that Nurse

Stewart relayed Plaintiff's complaints of leg pain." ECF No. 79 at 4 (citing ECF No. 68-15,

medical orders).  The medical records do not confirm this.  The medical record cited, ECF No.

68-15, contains three separate entries dated November 6, 2007; November 28, 2007; and

November 30, 2007.  The November 30th entry was signed and dated by Nurse Richards, and

---

[6]  Interestingly, Defendants substantially rely on their "unsworn" declarations. *See, e.g.*,
ECF Nos. 68-3; 68-4; 68-5; 68-6; 68-7; 68-8.

(5:11cv2360)

reads, "T.O. D. Volk/C Richards RN."[7]  ECF No. 68-15.  Defendants do not explain how a medical record apparently signed and dated by Nurse Richards confirms that Nurse Stewart relayed Plaintiff's complaints of leg pain to Dr. Volk.

When questioned by DYS Inspector Rebecca Martin, Dr. Volk provided the following about December 2, 2007,[8]

> RM:  Okay, is this the first time that you had any contact with anyone about this youth?
> BV:  Yes
> RM: Okay, so this is the first that you even heard he was sick?
> BV:  Correct
> . . . .
> RM:  I have here an order for an x-ray, and it says that you ordered the x-ray.  Did you order this x-ray?
> BV:  No
> RM:  Okay so what did they, do you think they just put your name down as the ordering physician or ...
> BV:  Correct
> RM:  . . . even without discussing it with you?
> BV:  Correct

ECF No. 75-5 at 2-3.  *See also* ECF No. 77-4 at 30, 48 (Dr. Volk testifying that, per annual standing orders, the nurses could dispense medication or order an x-ray based on a youth's complaint without first having to ask permission); at 75-76 (Dr. Volk testifying that she does not remember if the nurses called her prior to Plaintiff's admittance into the hospital).  The orders relied on by Defendants are signed by Dr. Volk and dated December 5, 2007—one week after the

---

[7]  "T.O." stands for telephone order.  ECF No. 77-4 at 77.

[8]  Although the interviewer stated the date Plaintiff was admitted to the hospital as September 2, 2007, he was admitted on December 2, 2007.  *See* ECF Nos. 75-5 at 1; 1 at 10, ¶41.

(5:11cv2360)

x-ray was taken and three days after Plaintiff's admission to the hospital. These orders do not make clear whether Dr. Volk was consulted and dispensed medical orders on November 30, 2007. To add to the uncertainty, Nurse Welfle testified that Dr. Volk would review and sign the charts and orders from the previous week when she visited the facility. ECF No. 78-1 at 17. There is a genuine issue of fact regarding whether the nurses notified the attending physician, Dr. Volk.

Defendants also argue that the evidence shows that Nurse Stewart contacted her supervisor, Robert Walker, R.N. ECF No. 79 at 4 (citing Stewart's deposition). Although Stewart stated in her deposition that she informed Supervising Nurse Walker that Plaintiff had hip pain and was developing a low-grade temperature, ECF No. 77-5 at 10, Walker stated in his declaration that, "[a]lthough I have no recollection of specific details in this case, I acknowledge that my signature is reflected on the November 28, 2007 x-ray report as being signed on November 29, 2007." ECF No. 69 at 2. Walker also stated, in his interview during the DYS investigation, that the nurses had not notified him of Plaintiff's condition. ECF No. 75-21 at 28. Thus, a genuine issue of fact exists as to whether Nurse Stewart notified her supervisor.[9]

**B. The Investigative Report is Not Inadmissible Hearsay**

Relying on Federal Rule of Evidence 803(6), the business records exception, Defendants argue that Plaintiff's opposition brief improperly relies on the DYS investigative report, rather than depositions. ECF No. 79 at 5. They assert that the DYS report was "conducted/created by

---

[9] Nurse Stewart testified that she verbally informed Walker that she was concerned about Plaintiff's pain and temperature, but that Walker indicated that because the x-ray was negative she should not worry about it. ECF No. 77-5 at 10-11.

(5:11cv2360)

non-medical individuals.  The statements made therein were neither sworn to, or verified for accuracy."  ECF No. 79 at 5.  They further contend that the DYS report "lacks the indicia of reliability necessary for its admission" pursuant to Fed. R. Evid. 803(6), because the "drafters did not have the requisite experience to form the medical opinions therein."  ECF No. 79 at 6.

As an initial matter, the Court notes that the DYS report is not being used by Plaintiff for its medical opinions.  Rather, it is relied on for its factual findings regarding the timeline of treatment Plaintiff received and explanations given by staff members about that treatment.  Contrary to Defendants' assertion, it does not take medical training for an individual to ascertain whether the nurses notified either the nursing supervisor or the treating physician.

Furthermore, the case Defendants rely on, *Dorsey v. City of Detroit*, 858 F.2d 338 (6th Cir. 1988), does not support their position.  In *Dorsey*, the Court considered whether a report created by a police officer during the ordinary course of business lacked trustworthiness and was therefore inadmissible.  In *Dorsey*, the plaintiff, suing police officers, challenged the report on the basis that it was self-serving.  *Id.* at 343.  In contrast, Defendants in the instant case are challenging a report created by their own employer because it appears as though it is not self-serving.  ECF No. 79 at 5-6.  Moreover, the *Dorsey* Court found,

> the district court would have had discretion to admit Sergeant Graber's report if it had been produced during discovery, because production in advance would have enabled plaintiffs' counsel to prepare himself to test its trustworthiness at trial.  The defendants' witnesses could have been cross-examined in light of the report, and the jury could have made an informed judgment on how much weight the report deserved.

858 F.2d at 343.  Defendants in the instant case do not argue they lacked opportunity to test the trustworthiness of their own employer's report.  Defendants have had, in their motion briefing, "a

12

(5:11cv2360)

fair opportunity to challenge the report's credibility," *id.*, and have challenged the report by asserting that the medical conclusions therein were not reached by individuals with medical training or expertise.  *See* ECF No. 79 at 5.   Defendants' Rule 803(6) argument is not, therefore, well-taken.

### C.  Defendants Waived Their Argument in Opposition to Dr. Suh's Opinion

Despite the Court having denied Defendants' motions to disqualify and exclude the report generated by Plaintiff's expert, Dr. Gina Suh, *see* ECF Nos. 66; 73, Defendants now contend that "the opinions rendered by Dr. Suh should not be considered in this case. . . [because] she was never disclosed during *Initial Disclosures*, as required by Fed. R. Civ. P. 26 and 37."  ECF No. 79 at 6 (emphasis in original).  At the threshold, because Dr. Suh is an expert witness, not a fact witness, her role need not have been disclosed during initial disclosures.  *See* Fed. R. Civ. Pro. 26(a)(2).  Also, Defendants failed to raise this argument when they previously challenged the timeliness of Dr. Suh' report.  *See* ECF No. 65 at 2 (Defendants' Motion to Exclude Plaintiff's Expert Report, wherein Defendants assert that Dr. Suh is a rebuttal expert and that, pursuant to Fed. R. Civ. Pro. 26(a)(2)(D), Plaintiff was required to disclose Dr. Suh within thirty days of Defendants' expert witness disclosure).  Instead, Defendants advance the initial disclosure argument for the first time in their Reply brief and, as such, this argument is waived.  *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) (issues raised for the first time in a reply brief are waived); *U.S. v. 2007 BMW 335i Convertible*, 648 F.Supp.2d 944, 952 (N.D.Ohio 2009).

(5:11cv2360)

### D. Eighth Amendment Claim

Defendants contend that Plaintiff's allegations do not rise to the level of deliberate indifference. They argue that "Plaintiff's complaints equate to holding the Defendant nurses to [an] unprecedented standard of care, whereby they should be able to discern a radiologist's missed diagnosis of the fracture of Plaintiff's left iliac or to realize he had a septic infection." ECF No. 79 at 8. They assert that it was not until December 2, 2007 that Plaintiff "presented with a low grade temperature, early signs of dehydration, rebound tenderness and smelling of fecal matter, which immediately prompted the nurses to send him to the Emergency Department." *Id*.

As an initial matter, the Court notes that the medical records indicate Plaintiff first "presented with a low grade temperature" on November 29, 2007, as indicated by Nurse Stewart's progress notes. *See* ECF No. 74-5 at 10; 75-3. Moreover, Plaintiff is not alleging that the nurses were deliberately indifferent because they failed to diagnosis Plaintiff with a septic infection or because they did not properly interpret Plaintiff's x-ray. Rather, Plaintiff alleges that the nurses were deliberately indifferent because they failed to inform a medical doctor of Plaintiff's hip injury, which appeared to have been getting worse, and of the onset of other symptoms. ECF No. 77 at 16. Thus, Plaintiff asserts, "the material question of fact in this case is whether, after documenting multiple complaints of hip, pelvic and upper-leg pain, fever, and chest pain without having Sanford examined by a doctor, the defendants ignored Sanford's serious medical need for further diagnosis and treatment by a physician." ECF No. 77 at 16.

The Supreme Court has held that deliberate indifference by prison personnel to an

14

(5:11cv2360)

inmate's serious medical needs violates the inmate's right to be free from cruel and unusual

punishment.  *Estelle v. Gamble*, 429 U.S. 97 (1976).  In the Sixth Circuit,

> [w]e employ a two-prong test with objective and subjective components to assess such claims. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). First, we determine whether the plaintiff had a "'sufficiently serious' medical need" under the objective prong. *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008). A medical need is sufficiently serious if it has been diagnosed by a physician that has mandated treatment or it is so obvious that even a lay person would easily recognize the need for medical treatment. *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 897 (6th Cir. 2004). Second, we determine whether the defendant had a "'sufficiently culpable state of mind'" in denying medical care under the subjective prong. *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (quoting *Farmer*, 511 U.S. at 834). There must be a showing of more than mere negligence, but something less than specific intent to harm or knowledge that harm will result is required. *See Farmer*, 511 U.S. at 835. The defendant must have "[k]nowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs." *Blackmore*, 390 F.3d at 896 (internal quotation marks omitted). Where the plaintiff has received some medical treatment, "federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). However, it is possible for the treatment provided to be "so woefully inadequate as to amount to no treatment at all." *Id.*; accord *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir.2011).

*Burgess v. Fischer*, – F.3d – , 2013 WL 5873323, at *8  (6th Cir. Nov. 1, 2013).

### 1. Objective Component

In *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 897 (6th Cir. 2004), the Sixth Circuit

discussed two "branch[es]" of cases establishing the objective standard for a serious medical

need: (1) when the need "is so obvious that even a lay person would easily recognize the

necessity for a doctor's attention"; and (2) when the seriousness of a prisoner's medical needs

15

(5:11cv2360)

"may *also* be decided by the *effect* of delay in treatment."[10] *Id.* (emphasis in original) (quoting G*audreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir. 1990); *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994)).  A plaintiff who brings a claim based on the effect of the delay in treatment "must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed." *Id.* at 898 (quoting *Napier v. Madison County*, 238 F.3d 739, 742 (6th Cir. 2004).  "*Napier* applies where the plaintiff's 'deliberate indifference' claim is based on the prison's failure to treat a condition adequately, or where the prisoner's affliction is seemingly minor or non-obvious.  In such circumstances, medical proof is necessary to assess whether the delay caused a serious medical injury." *Id.*, citing *Napier*, 238 F.3d at 742.

Plaintiff does not indicate which branch his case stems from, nor does he discuss the controlling Sixth Circuit cases listed above.[11]  The Court will, therefore, consider Plaintiff's arguments under both theories.

### a.  "So Obvious That Even a Lay Person Would Easily Recognize the Necessity for a Doctor's Attention"

Plaintiff, on numerous occasions, complained to nurses of hip and leg pain.  The complaints began on September 20, 2007 after Plaintiff suffered an injury while playing football

---

[10]  There is also a third test—the "diagnosed by a physician" test.  Plaintiff cannot meet this test because an "after-the-fact medical diagnosis of [his injuries] at the hospital" is not sufficient to meet the serious medical need prong.  *Burgess*, 2013 WL 5873323, at *9 (relying on *Napier v. Madison Cnty., Ky.*, 238 F.3d 739, 742 (6th Cir. 2001) and explaining that the diagnosis must be made prior to the defendant's alleged acts).

[11]  Instead, Plaintiff relies on case law from other circuits in addition to pre-*Blackmore* cases within the Sixth Circuit.

(5:11cv2360)

at IRJCF.  ECF No. 77 at 7.  He complained about hip pain on October 10 and October 11, 2007.

ECF No. 77-7; 77-8. Beginning November 27, 2007 and for the next five days, Defendants

documented at least ten contacts with Plaintiff regarding ongoing, unresolved and worsening left

hip, leg or pelvic pain.  *See* ECF Nos. 75-3 at 44-46; 75-4; 75-1 at 4-5.

Plaintiff had been observed limping.  *See, e.g.*, ECF Nos. 75-10 (video of Plaintiff

limping while playing basketball prior to the aggravating incident on November 28, 2007); 75-3

at 52 (medical records noting Plaintiff was limping on September 20, 2007).

On Tuesday, November 27, 2007 Plaintiff submitted a "health services request" on which

he wrote "left leg when I walk it causes me pain."  ECF No. 75-4.  In the early hours of

Wednesday, November 28, 2007, Plaintiff's complaint of hip pain was documented.  *See* ECF

No. 75-1 at 27.[12]  Despite Dr. Volk visiting the clinic every Wednesday morning to see youths on

her call list, the nurses did not add Plaintiff to the list for Wednesday, November 28, 2007.[13]  Dr.

Volk testified that the "health call list" was comprised of youth "who had developed any health

complaints from my previous visit ... a sick visit.  So if a kid had a sore throat or a cough or an

injury that wasn't better, then they were put on what they call the 'health call list.'"  ECF No. 74-

4 at 29.  Dr. Volk or another physician was on call at all times.[14]  ECF No. 77-4 at 34.

---

[12]  The DYS Report indicates, "[t]he first entry in the unit log was on November 28, 2007 @ 12:26 a.m. (Youth Sanford complaining of pain on hip medical notified)."  ECF No. 75-1 at 27.

[13]  Nurse Stewart, in her declaration, stated that she added Plaintiff's name to the call list on Thursday evening, November 29, 2007, to be seen the following Wednesday, December 5, 2007.  ECF No. 68-7 at 2, ¶7.  Plaintiff was taken to the hospital on Sunday, December 2, 2007.

[14]  *See supra*, note 1.

17

(5:11cv2360)

After the aggravating incident in the gym, Plaintiff was shown on video, in obvious distress, being half-carried into the medical clinic by fellow residents— even juvenile detention inmates recognized the need for medical attention.  *See* ECF No. 75-13; 75-14.  Video footage taken in the clinic shows Plaintiff unable to sit up straight, unable to put on his own sock, and gesturing to his left side.  *See* ECF No. 75-15.  He left the clinic in a wheelchair.  *See* ECF No. 75-16.  Defendants continued to give Plaintiff only Motrin for his pain and did not inform a doctor.  The DYS Standard Operating Procedure regarding medication instructed that "[t]he nurse shall notify the physician during the course of treatment if the juvenile does not respond to the treatment and/or symptoms worsen."  ECF No. 75-20 at 3.

On November 29, 2007, IRJCF records reveal: Plaintiff's hip pain; that he was limping; and that he had a fever.  ECF No. 75-3 at 46.  By Saturday morning, December 1, 2007, Plaintiff had refused medication and continued to complain of hip pain.  *Id*.  He did not leave his dorm for lunch.  ECF No. 75-1 at 27.  He was next seen Saturday night at 9:00 p.m.  ECF No. 75-3 at 44.  Nurse Flood's documentation reads, "Meds to dorm.  Youth lying in bed refuses to get up c/o chest pain[.]  Youth finally raised torso up slightly and took meds.  When asked how long he'd had chest pain he laid back down and covered his head with his blanket."  *Id.*.

The next morning, December 2, 2007, Plaintiff refused to get out of bed and refused breakfast and lunch.  ECF No. 75-1 at 27.  There is no documentation showing that the nurses brought his medication to his dorm or checked on him.  At 12:20 p.m. nurses were called to see a youth with "hip pain."  ECF No. 75-3 at 44.  He was taken to medical in a wheelchair and "required assistance in transport from chair to exam table."  *Id*.  He was running a fever, was

18

(5:11cv2360)

dehydrated, demonstrated "extreme tenderness" in the left inguinal area and "smell[ed] of fecal material." *Id*.  Finally, Plaintiff was then sent to the ER for further evaluation.  *Id*.

The Court finds that, based upon the forgoing, Plaintiff has presented sufficient evidence from which a jury may infer that, prior to his admittance into the hospital on December 2, 2007, his injury and illness was "so obvious that even a layperson would easily recognize the necessity for a doctor's attention."  *See Blackmore*, 390 F.3d at 899-900.

### b.  "Effect of Delay in Treatment"

To the extent Plaintiff's injury or illness may be considered seemingly minor or non-obvious, Plaintiff must allege "medical proof [ ] to assess whether the delay caused a serious medical injury."  *Id*. at 898, citing *Napier*, 238 F.3d at 742.  Plaintiff argues that Defendants' delay in providing him proper medical care caused him to become septic.  ECF No. 77 at 18. Defendants, relying on *Napier*, argue that Plaintiff "cannot show that the purported delay worsened the already existing septicemia."  ECF No. 79 at 9.

The Court notes that Plaintiff alleges he became septic precisely because his condition was not discovered sooner, due to the delay in medical treatment.  *See* ECF No. 77 at 18. Defendants' argument that their actions did not worsen the illness Plaintiff alleges they originally caused is not responsive.

Plaintiff's expert Dr. Gina Suh explained in her report,

It is my opinion, with reasonable medical certainty, that Mr. Sanford's course of infection began with an undiagnosed pelvic fracture (specifically, a fracture of the iliac crest) which remained undiagnosed for possibly as long as two months (the first complaint of pain by Mr. Sanford in the medical records pertaining to this area of the body was on September 20, 2007). In the context of a non-healing fracture, Mr. Sanford developed a transient bacteremia, that is, the presence of

19

(5:11cv2360)

bacteria in the blood stream. Bacteremia of itself is not an uncommon occurrence, as humans become bacteremic up to nine times per day according to some studies, often merely as the result of daily activities, such as flossing one's teeth. However, in Mr. Sanford's case, the bacteria attached to the site of his pelvic fracture and formed an abscess, which is a larger collection of infection. The formation of an abscess sets off the body's systemic response to infection, including inflammatory responses, and is characterized by symptoms of pain and/or tenderness. Abscess formation in or around a fracture can be facilitated by physical disturbances to the area of the fracture – jostling or other impacts. The formation of Mr. Sanford's pelvic abscess was likely exacerbated by the incident during recreation on November 28, 2007 in which Mr. Sanford was reportedly hit in the hip area by another juvenile.

* * *

It is my opinion, with reasonable medical certainty, that during the 4 day period beginning on or about November 28th through December 1st, Mr. Sanford's fracture was developing an infected abscess which progressed into an overwhelming staph septicemia, requiring extended hospitalization and care in the ICU ("intensive care unit"). A severe staph bacteremia developed from the abscess which led to the development of septic emboli. These conditions placed Mr. Sanford's life at risk and required intensive treatment which included blood pressure support with pressor medications, drainage of the abscess to control the source of the infection, and a prolonged course of antibiotics.

ECF No. 71-1 at 1-2. Plaintiff also relies on the DYS Investigative Report, in which Defendants'

expert, Dr. Volk, was interviewed by the investigator regarding the severity of Plaintiff's illness:

RM: Okay, in your opinion, [] from the first _____ of his complaint of the hip pain, until we actually transported, do you think his condition worsened as a result of that [sic] not transporting him out or not getting him treated?

BV: Most definitely because I don't think the infection would have gotten to the point where it was and he certainly would probably not have developed pneumonia had this all been addressed earlier.

RM: Okay, so, in your mind, was his medical care appropriate from the first onset of pain?

BV: No

RM: And where do you think the breakdown was?

20

(5:11cv2360)

BV: That when he started complaining of more pain, they never had a physician examine him.

ECF No. 75-1 at 39.

The Court finds that Plaintiff has presented sufficient evidence in the form of medical proof from which a jury can assess whether the delay caused a serious medical injury.  *See Blackmore, 390 F.3d at 898*.

### 2. Subjective Component

To withstand Defendants' motion, Plaintiff must also show that Defendants subjectively perceived a substantial risk to Plaintiff, which they disregarded.  *See Dominguez v. Corr. Med. Servs., 555 F.3d 543, 550 (6th Cir. 2009)*.  "[D]eliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk."  *Id.* (quoting *Phillips v. Roane County, Tenn., 534 F.3d 531, 540 (6th Cir. 2008)*, citing *Comstock v. McCrary, 273 F.3d 693, 703 (6th Cir. 2001)*).  The subjective component "may be 'demonstrated in the usual ways, including inference from circumstantial evidence ... and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'"  *Id.*, quoting *Terrance v. Northville Reg'l Psychiatric Hosp., 286 F.3d 834, 843 (6th Cir. 2002)*, citing *Farmer, 511 U.S. at 842*.

Defendants argue that Plaintiff does not point to specific evidence whereby they "either denied or delayed rendering him appropriate care.  Consequently it is impossible for Plaintiff to substantiate a claim of knowledge against the Defendants for denying him care that was, in actuality, provided to him."  ECF No. 68 at 13.  They also contend that it was impossible for them to have subjective awareness Plaintiff had a fracture or had acquired sepsis.  ECF No. 79 at

21

(5:11cv2360)

10.

As noted, Plaintiff does not suggest Defendants should have known he had a fracture or had acquired sepsis.  Defendants do not respond to Plaintiff's argument that the care provided to him, warm compresses and Motrin, was inadequate, and that Defendants "disregarded his deteriorating symptoms and did not have him seen by a doctor."  ECF No. 77 at 18.  Plaintiff's argument is a viable theory to present a deliberate indifference case.  *See Dominguez*, 555 F.3d at 546-552 (inmate received perfunctory treatment by nurse when he collapsed and became ill after outdoor exercise on a hot day; summary judgment denied because nurse was aware or should have been aware of dangers of heatstroke, not because she did not know specifically that heat stroke could leave inmate a quadriplegic); *see also Terrance*, 286 F.3d at 843 ("'[W]hen the need for treatment is obvious, medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference[,]'" quoting *Mandel v. Doe*, 888 F.2d 783, 789 (11th Cir.1989)); *id*. at 844 ("[A] prison employee's two-hour delay in providing medical care to an inmate known to have a serious condition may constitute deliberate indifference.")).

### a.  Perceived Substantial Risk

Plaintiff does not clearly state when he believes his substantial risk began: on September 20, 2007 when he suffered what is believed to be his original hip injury; or on November 28, 2007 when he aggravated his injury and began to show signs of "deteriorating symptoms."  ECF No. 77 at 18.  It does not appear from the record that Plaintiff showed signs of deteriorating symptoms prior to the aggravation of his injury on November 28, 2007.  Plaintiff complained once on September 20, 2007 of hip pain; twice in October 2007, on the 10th and the 11th; and

22

(5:11cv2360)

then again on November 27 and 28, 2007.  Plaintiff's complaints, while worthy of concern, do not appear to indicate a substantial risk that his condition was deteriorating.  Although it is perplexing that the nurses did not notify the doctor, and may have disregarded DYS standard policy in not doing so, the behavior of individual nurses that reviewed Plaintiff's complaints during the time frame of September 20, 2007 to November 28, 2007, alone, does not amount to more than negligence— it cannot be said that the failure to notify Dr. Volk during this pre-aggravation time rose to the level of recklessly disregarding a substantial risk of serious harm to Plaintiff.  *See Dominguez*, 555 F.3d at 550; *see also Reilly v. Vadlamundi*, 680 F.3d 617, 626 (6th Cir. 2012) ("in hindsight, looking at Plaintiff's subsequent medical history, additional treatment may have been appropriate in this case.  However, when Dr. Vadlamudi treated Plaintiff, there was no indication he was suffering from a rare form of bone cancer—only minor symptoms."); *c.f. McElligott v. Foley*, 182 F.3d 1248, 1259 (11th Cir. 1999) (doctor and nurse both aware of inmate's ongoing complaints and deteriorating condition for five months, and did not treat the deteriorating state).

The perceived substantial risk in the instant case, therefore, is Plaintiff's deteriorating condition after his injury was aggravated on November 28, 2007.  *See also* ECF No. 71-1 at 1-2 (Dr. Suh's report wherein she opines that "during the 4 day period beginning on or about November 28th through December 1st, Mr. Sanford's fracture was developing an infected abscess which progressed into an overwhelming staph septicemia, requiring extended hospitalization and care in the ICU.").

23

(5:11cv2360)

### b. Knowingly Disregarded

Plaintiff generally presents his allegations against all Defendants collectively.  To prevail, Plaintiff must present evidence that each Defendant subjectively perceived a substantial risk to Plaintiff, which she disregarded.  *See Reilly*, 680 F.3d at 626-627 ("the collective acts of defendants cannot be ascribed to each individual defendant," and that "Plaintiff's most severe symptoms occurred after his contacts with these Defendants.").

### i. Nurse Stewart

Nurse Stewart was present on four occasions that Plaintiff complained of left hip or leg pain.  ECF No. 74-5 at 6.  She documented his pain and limping after his initial injury on September 20, 2007.  ECF No. 74-5 at 8-9.  She saw him on October 12, 2007, when Plaintiff complained of leg pain.  ECF No. 68-7 at 1, ¶6.  Although Nurse Stewart stated that she was not the "nurse initiating the assessment" on November 28, 2007, she saw Plaintiff when he presented to the medical clinic in distress after aggravating his injury.  ECF No. 74-5 at 7.  She testified in her deposition that she was concerned that Plaintiff was running a fever in addition to having unresolved hip pain on November 29, 2007.  ECF No. 74-5 at 10.  Nevertheless, she did not notify the doctor, and a factual issue exists as to whether she notified her supervisor.  *Id*.

Thus, despite knowing that Plaintiff initially injured his hip on September 20, 2007; that it had remained unresolved and then aggravated on November 28, 2007; and that Plaintiff had shortly thereafter developed a fever, Nurse Stewart did not contact Dr. Volk, and a factual issue exists as to whether she told her supervisor.  Although she placed Plaintiff on Dr. Volk's call list, the next scheduled call list was six days away.  Based on the foregoing and viewed in a light

24

(5:11cv2360)

most favorable to him, Plaintiff presents sufficient evidence to show that a jury could find that

Nurse Stewart's care could be found to be so cursory or woefully inadequate as to amount to no

treatment at all, and that she recklessly disregarded a substantial risk of harm to Plaintiff.  *See*

*Terrance*, 286 F.3d at 843; *Alspaugh*, 642 F.3d at 169.

### ii.  Nurse James

Nurse James saw Plaintiff in the medical clinic after he aggravated his injury on

November 28, 2007.  Although she testified that, contrary to Nurse Stewart's testimony, she "did

not access him,"[15] ECF No. 74-6 at 4, Nurse James made an entry in Plaintiff's progress notes

stating, "[t]o medical from Rec c/o severe L hip pain.  Call placed to Mobilex to have x[-]ray

done toni[ght] instead of AM ... 600mg Motrin given for pain.  Ambulated [with] a limp out of

Medical."[16] ECF No. 75-3 at 45.

Plaintiff does not identify evidence that Nurse James was involved in any previous or

further treatment of him.  Although Nurse James, like the others, did not notify the doctor, she

did call for the x-ray unit to come at that time, instead of the next day.  She also gave Plaintiff

pain medication.  It cannot be said that these facts would lead a reasonable jury to find Nurse

James' treatment to be so woefully inadequate or cursory as to amount to no treatment at all.

*See* *Terrance*, 286 F.3d at 843; *Alspaugh*, 643 F.3d at 169.

---

[15]  The DYS Investigation identified the two nurses in the medical clinic with Plaintiff on November 28, 2007 as Nurses Stewart and James.  ECF No. 75-1 at 4.

[16]  "c/o" means "complaint of."  ECF No. 77 at 9.  In the video, Plaintiff appears walking with a limp from an interior room back to a common room, where he then is placed in a wheelchair.  ECF No. 75-16.

(5:11cv2360)

### iii.  Nurse Welfle

Nurse Welfle saw Plaintiff on the morning of Wednesday, November 28, 2007, after Plaintiff complained of leg pain.  ECF No. 75-3 at 45.  She did not notify Dr. Volk, despite Dr. Volk's visit at IRJCF that morning.  She gave Plaintiff Tylenol for his pain and advised he stretch before sports.  *Id*.  Welfle saw Plaintiff again at 3:00 p.m. when he submitted a Health Services Request about leg pain and requested an x-ray.  ECF No. 75-4.

Nurse Welfle next saw Plaintiff on November 29, 2007, after the aggravation of his injury and after he had refused to come to medical due to his sore hip— her notes read that he "has been walking normal all day, Was sent to ISS— now stating leg hurts."  ECF No. 75-3 at 46.  The following morning, November 30, 2007,  Nurse Welfle again assessed Plaintiff for hip pain. ECF No. 75-3 at 46.  Her progress note entry indicates that the x-ray had come back negative; that Nurse Richards had noted bruising; that Motrin would be given to him four times a day; and that Plaintiff should "try to walk normal."[17]  ECF Nos. 75-3 at 46; 75-17 at 8.  Nurse Welfle did not assess him.  She stated that she was aware of the other entries in the progress notes entered by the other nurses that documented hip pain during the time frame she was documenting hip pain. ECF No. 78-1 at 16.  These entries include notes that Plaintiff had a temperature and that his injury was tender to the touch.  ECF No. 75-3 at 46 (notes entered between Nurse Welfle's notes).

Despite Nurse Welfle's awareness of other entries documented by the nurses regarding

---

[17]  Nurse Welfle stated in her deposition that because Nurse Richards thought Plaintiff had a bruise, the best course of action is to try to walk as normal as possible.  ECF No. 78-1 at 15.

(5:11cv2360)

Plaintiff's hip pain, limping, tenderness and a temperature in addition to Nurse Welfle's own four

entries within two days documenting Plaintiff's complaints of hip pain, including the first

complaint that occurred at the time Dr. Volk was on site, she did not notify the doctor, despite

Plaintiff's deteriorating condition. A reasonable jury could find that Nurse Welfle's care was so

cursory or woefully inadequate as to amount to no treatment at all, and that she recklessly

disregarded a substantial risk of harm to Plaintiff. *See Terrance,* 286 F.3d at 843; *Alspaugh*, 642

F.3d at 169.

### iv.  Nurse Richards

Nurse Richards had two documented interactions with Plaintiff. On the morning of

November 29, 2007, at 7:30 a.m., she gave him Motrin for severe pain in his left hip. ECF No.

75-3 at 45. She checked on him again a little over three hours later, noted that the pain was "not

quite as bad," and "re-medicated him pursuant to the treating physician's standing orders." ECF

Nos. 75-3 at 45; 68-6 at 1, ¶5. On the morning of November 30, 2007, she "obtained an order for

scheduled Motrin to be administered at 400 milligrams orally, four times per day." ECF Nos. 68-

6 at 1, ¶6 ; 68-15.

Although Nurse Richards treated him for his pain early in the morning on November 29,

2007 then checked on him less than four hours later when the pain had subsided somewhat, she

"obtained an order" for Motrin on November 30, 2007, by which time Plaintiff had complained

at least twice more of leg pain and progress notes indicated he had had a fever. Despite his

ongoing and deteriorating condition, Nurse Richards merely provided Plaintiff with more of the

same treatment he had been receiving. Her treatment could be found to be so cursory or woefully

27

(5:11cv2360)

inadequate as to amount to no treatment at all, precluding summary judgment.  *See Terrance*, 286 F.3d at 843; *Alspaugh*, 642 F.3d at 169.  A reasonable jury could find that Nurse Richards perceived a substantial risk to Plaintiff and that she recklessly disregarding such a risk.

### v.  Nurse Moore

In Nurse Moore's declaration she states that she first saw Plaintiff on October 12, 2007 after Plaintiff "reported experiencing leg pain while lifting weights."  ECF No. 68-5 at 1, ¶5.  She stated that she believed it was a muscle strain and treated it with Motrin.  *Id*.  She saw him again on November 29, 2007, after he refused to come to medical due to his sore hip— she instructed staff to bring him to medical to be evaluated.  *Id*. at ¶6.  It is not clear whether she or Nurse Richards evaluated Plaintiff.  She states that she knew the x-ray was negative and that Plaintiff received Motrin.  *Id*.

Nurse Moore saw Plaintiff again on December 1, 2007.  *Id*. at ¶7.  Her progress notes reflect that she was aware Plaintiff had refused earlier to come for his medication.  ECF No. 75-3 at 46.  She states in her declaration that "[b]y this time I was aware that the treating physician, Dr. Volk had been notified and an order had been received to administer scheduled doses of Motrin or Ibuprofen."  ECF No. 68-5 at ¶7.  She declares that, in accordance with this order, she reviewed the negative x-ray with Plaintiff and gave him Motrin.  *Id*.  She noted that Plaintiff refused to allow her to do an assessment, and that she told him to apply a warm compress.  *Id*. The next time Nurse Moore saw Plaintiff, it was on December 2, 2007 at 12:33 p.m. in his dormitory, following Plaintiff's complaints of hip pain.  After Nurses Moore and Flood observed him suffering from dehydration, rebound tenderness, and a fever, Plaintiff was transported to the

28

(5:11cv2360)

hospital's emergency room.  *Id.* at ¶¶8.9.

Although Nurse Moore stated that she was aware Dr. Volk had been notified, the record does not confirm that Dr. Volk had been notified.  To the extent Nurse Moore argues that she relied on the November 30, 2007 order, the Court has already determined the order does not clearly evince Dr. Volk issued the order, and a factual issue exists as to whether Dr. Volk been notified.  Nurse Moore does not offer an alternative explanation for why she believed Dr. Volk had been notified, and none is apparent from the record.

Furthermore, by the time Nurse Moore saw Plaintiff on the morning of December 1, 2007, she knew that he continued to complain of hip pain, that he had at least three times refused to "come for medication," and that the progress notes, had she viewed them, indicated Plaintiff had a temperature on November 29, 2007.  *See* ECF No. 75-3 at 45-46.  Despite Plaintiff's obviously deteriorating condition, Nurse Moore did not notify a doctor.  Instead, she told Plaintiff to apply a "hot moist washcloth" and to come for medication in a few hours, something he had already been unable to do.

Accordingly, the Court finds that a reasonable jury could determine that Nurse Moore's care was so cursory or woefully inadequate as to amount to no treatment at all, and that she recklessly disregarded a substantial risk of harm to Plaintiff.  *See Terrance,* 286 F.3d at 843; *Alspaugh,* 642 F.3d at 169.

### vi.  Nurse Flood

In Nurse Flood's declaration she states that the records reflect she first saw Plaintiff on December 1, 2007 at 9:05 p.m.  ECF No. 68-3 at 1, ¶5.  She states, "[i]t is my recollection that I

29

(5:11cv2360)

took medications to Mr. Sanford's dorm room to be assured he received his medications as well as to check up on him after receiving a nursing update of his complaints of leg pain." *Id.* at ¶6. Flood's progress note reads, "youth finally raised torso up slightly [and] took meds. When asked how long he'd had chest pain he laid back [down and] covered his head [with] his blanket." ECF No. 75-3 at 44. Nurse Flood's next interaction with Plaintiff occurred the following day shortly after noon, when she received a call from a staff member that Plaintiff was complaining of hip pain. ECF No. 68-3 at 2, ¶8.

The record reflects that, despite having knowledge of Plaintiff's deteriorating condition— "nursing updates" of Plaintiff's complaints of leg pain, *see id.* at ¶6; progress notes documenting Plaintiff's refusal the morning of December 1, 2007 to come for his medication and a meal tray delivered to his dorm, *see* ECF No. 75-3 at 46 (progress notes for December 1, 2007 at 8:30 a.m.), ECF No. 75-1 at 27 (DYS unit log summary indicating complaints that morning and a meal tray); knowing that on the evening of December 1, 2007 Plaintiff had chest pain and could or would not "get up," *see* ECF No. 75-3 at 44— Nurse Flood did not notify the doctor. Rather, she gave Plaintiff his scheduled medication and then left. A reasonable jury could find that Nurse Flood's care was so cursory or woefully inadequate as to amount to no treatment at all, and that she recklessly disregarded a substantial risk of harm to Plaintiff. *See Terrance,* 286 F.3d at 843; *Alspaugh,* 642 F.3d at 169.

In sum, viewing all the facts in a light most favorable to the Plaintiff, a reasonable jury could conclude that Nurses Stewart, Welfle, Richards, Moore and Flood were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed and that

(5:11cv2360)

they ignored that risk.  *See Farmer*, 511 U.S. at 837.

### E. Qualified Immunity

Defendants contend they are entitled to qualified immunity.

"To state a claim under 42 U.S.C. § 1983, a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir.2006) (citing *West v. Atkins*, 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988)). "Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Phillips v. Roane County*, 534 F.3d 531, 538 (6th Cir.2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Determining whether the government officials in this case are entitled to qualified immunity generally requires two inquiries: "First, viewing the facts in the light most favorable to the plaintiff, has the plaintiff shown that a constitutional violation has occurred? Second, was the right clearly established at the time of the violation?" *Id.* at 538-39 (citing *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir.2006)); cf. *Pearson v. Callahan*, --- U.S. ----, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (holding that the two-part test is not longer considered mandatory; thereby freeing district courts from rigidly, and potentially wastefully, applying the two-part test in cases that could more efficiently be resolved by a modified application of that framework).

*Dominguez*, 555 F.3d at 549.

Viewing the facts in the light most favorable to Plaintiff, Plaintiff has shown that a constitutional violation has occurred.  Moreover, the right was clearly established, and Defendants do not argue otherwise.  *See Dominguez*, 555 F.3d at 552 ("where circumstances are clearly sufficient to indicate the need of medical attention for injury or illness, the denial of such aid constituted the deprivation of constitutional due process," quoting *Estate of Carter v. City of Detroit*, 408 F.3d 305, 313 (6th Cir. 2005)); *see also Estelle*, 429 U.S. at 105–06.  Accordingly,

(5:11cv2360)

Plaintiff has satisfied both requirements for overcoming the qualified immunity defense asserted by Nurses Stewart, Welfle, Richards, Moore and Flood.

### IV.  Conclusion

For the reasons stated above, the Court denies Defendants' motion for summary judgment (ECF No. 68) and the qualified immunity defense as it pertains to Defendants Stewart, Welfe, Richards, Moore and Flood.  The Court grants the motion for summary judgment and qualified immunity as to Defendant James.


IT IS SO ORDERED.


December 31, 2013                      /s/ Benita Y. Pearson
Date                                                Benita Y. Pearson
                                                      United States District Judge

32